```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MICHAEL MARAGH,                     :

                 Petitioner,        :   REPORT AND RECOMMENDATION

       - against -                  :   04 Civ. 1339 (SCR) (MDF)

STATE OF NEW YORK,                  :

                 Respondent.        :
------------------------------------X
```

TO:  THE HONORABLE STEPHEN C. ROBINSON, U.S.D.J.

Petitioner, pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254 to challenge his conviction for criminally negligent homicide (N.Y. Penal Law §125.10).  The Orange County Court, Judge Berry, sentenced him to an indeterminate term of imprisonment of two (2) to four (4) years.  The Appellate Division, Second Department affirmed the conviction.  People v. Maragh, 299 A.D.2d 369, 749 N.Y.S.2d 162 (2d Dep't 2002), lv. denied, 99 N.Y.2d 630, 760 N.Y.S.2d 111 (2003).

Initially, Petitioner was convicted of criminally negligent homicide as a lesser included offense of an indictment which charged manslaughter in the first degree (N.Y. Penal Law §125.20) and manslaughter in the second degree (N.Y. Penal Law §125.15).  The jury had acquitted him of the manslaughter charges.  The Orange County Court, Judge Berry, set aside the criminally negligent homicide conviction for juror misconduct.  The Appellate Division reversed this order, People v. Maragh, 263 A.D.2d 493, 691 N.Y.S.2d 918 (2d Dep't 1999), and the New York Court of Appeals reversed the Appellate Division and reinstated

Judge Berry's order of dismissal. People v. Maragh, 94 N.Y.2d 569, 708 N.Y.S.2d 44 (2000).

The State subsequently refiled new charges against Petitioner. A review of the State's case pursuant to the usual standards, see Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002), discloses that the evidence was sufficient to support the conviction.

On March 18, 1997 May DeGroat, who lived with Petitioner in an apartment in Middletown and who was the mother of Petitioner's first child, gave birth to his second child. Her physician described the delivery as easy and cautioned her, in light of post delivery bleeding, to refrain from sexual intercourse for six (6) weeks.

On March 27, 1997 Donna DeGroat, May's mother, visited her at the apartment in Middletown. The two women ordered breakfast, which was delivered before 9:00 a.m., and then Donna left with the older child. May told her mother that she was going to shower and get dressed. At about 9:45 a.m. Darlene Pistone, the landlord, telephoned the apartment and asked Petitioner to relay a message to a new tenant that she was running late. She had told May the previous day that she intended to come by to see the new baby.

The purpose of the testimony of Donna DeGroat and Darlene Pistone was to establish that May DeGroat was fine and in good health shortly before the first of two telephone calls that

Petitioner made to 911 emergency services. During the first call, received at 10:30 a.m., Petitioner indicated that his wife was having convulsions and requested an ambulance. A few minutes later he telephoned again and stated that she appeared to be dead and was not breathing. He explained to the operator that they had started to have intercourse and she began to breathe heavily and to make noises.

When the initial responders arrived, Petitioner led them to the bedroom where they found May naked from the breasts down and lying on the bed. Petitioner told one of them that they had been attempting to have sexual intercourse when she started to shake and urinate. The responders checked May's vital signs; she had no pulse and was not breathing. They placed her on the floor for CPR. They also called for assistance.

Three members of the City of Middletown Fire Department arrived at the apartment where they found Petitioner in the living room. He was feeding the baby. He told one of them that May had fallen and urinated and asked if May was too young to have suffered a heart attack. While efforts at resuscitation continued, one of the firemen spoke with Petitioner who asked if May was going to live. The fireman responded that the medical personnel were doing what they could, and Petitioner asked if an individual could suffer a heart attack at any age. The fireman responded affirmatively, and Petitioner inquired about possible causes, one of which was obesity. Petitioner observed that May

3

was fat. She was 270 lbs.

Resuscitation efforts proved futile, so the personnel present gently and carefully moved May's body to a stretcher and then to the ambulance for transportation to Horton Hospital. During this process they did not drop the stretcher or the body. On arrival a physician at Horton Hospital observed that May was not breathing and had no pulse. Her pupils were fixed and dilated. The physician pronounced her dead at 11:55 a.m. The physician asked Petitioner what had occurred, and Petitioner said that they had been having sex with May on top and she just keeled over and became unresponsive.

Two pathologists performed autopsies. Initially Dr. Roh examined the body on May 27, 1997 and found no external injuries other than the presence of blood near the vagina, which blood extended to the thighs. May's abdomen contained approximately 1500 ccs of blood, the source of which was three traumatic injuries to her liver and spleen. The liver disclosed two lacerations and a subcapsular hemorrhage, which contained additional blood, a couple of hundred ccs, that had not emptied into her abdomen. The injury to the spleen was about 1 1/2" long and 1" deep. He likened the injuries suffered to those he would see in a serious car accident. From the location of the injuries, Dr. Roh concluded that while she was still alive, May had been the victim of at least two blows. Dr. Roh also ruled out CPR as the possible cause of the injuries because he found no

4

broken bones or ribs and in 27,000 autopsies had never seen spleen damage from CPR and had seen liver damage from CPR only twice.

On March 29, 1997, in a second autopsy Dr. Hubbard confirmed the trauma to the liver and spleen. He found a small bruise on the surface of May's diaphragm and an injury to the psoas muscle.[1] The injuries were consistent with blunt force trauma to the abdomen from a minimum of two separate impacts. Apparently, in a conversation, he told one of the police officers that the injuries to May's liver and spleen were comparable to what he would expect to see in a fall from a roof or a severe automobile crash. From the injuries and the blood loss Dr. Hubbard estimated that death could have occurred thirty (30) minutes to an hour after the injuries had been inflicted and that the victim would have suffered considerable pain.

As might be expected, while the first autopsy was underway, the police interviewed Petitioner at the apartment where they found him holding his child. He provided a written statement which elaborated on his prior statements. May had showered that morning, realized that she was no longer bleeding and asked Petitioner if he wanted to have sexual intercourse. Although he

---

[1] "Either of two muscles, one on each side of the loin, extending internally from the sides of the spinal column to the upper end of the femur, which assist in bending either the thigh or the lumbar portion of the trunk on the pelvis." Random House Dictionary of the English Language, unabridged ed. at 1160 (1973).

5

was reluctant because he was concerned about getting blood on his penis, Petitioner wore a condom and penetrated May "doggie style". After about five (5) minutes, she let out a long sigh and when she failed to respond to Petitioner, he rolled her over to discover that she had urinated in the bed. Petitioner then telephoned 911. He told the police that May had not complained of any pain. The police secured the condom Petitioner indicated he had used from a garbage can for analysis at the State Police Laboratory.

Given the findings of Dr. Hubbard in the second autopsy, the police reinterviewed Petitioner, who they found at Donna DeGroat's house. He accompanied them to the Middletown police station where, after advice of rights, he gave a written statement in which he stated that he had not struck May and that she had collapsed during sexual intercourse. When a detective asked him about how May might have died, Petitioner stated that she had rolled or fallen off the stretcher while being moved from the apartment and speculated that she may have been injured during the attempts at resuscitation. After having been taken to the state police barracks in Middletown and advised that a pathologist had attributed May's injuries to blunt force trauma, Petitioner denied that he had struck May but conceded that he had attempted CPR, which he did not know how to perform.

In addition to the statements to the police, prior to his arrest Petitioner had discussed the event with Elroy

6

Shulterbrant, who, at the time, shared a bedroom with May's mother.  Shulterbrandt could not believe that May, having been so healthy, was suddenly gone to which Petitioner explained that May had been talking with him and then suddenly fell over on the bed and started foaming from the mouth and changing colors.  On a subsequent occasion, when the subject arose a second time, Petitioner may have explained the event differently.  He said that after May had finished a shower, he approached her to have intercourse and she said no.  Petitioner then walked away from May and when he turned around, she fell over on the bed.  When Petitioner turned her over, she was foaming at the mouth and changing colors.  In a third conversation, the subject of which was not specified, Petitioner, apparently without reason or prompting to do so, said to Shulterbrandt, "You know, there is a thousand and one ways that you can kill a person without anyone knowing."  Tr. 1/30/01 at 456.

Subsequent analysis of evidence recovered from the apartment reiterated and perhaps emphasized that Petitioner's testimony could not be reconciled with the circumstantial evidence.  Blood was present on the sheet taken from the bed and on a maternity pad.  Blood was not present on the condom.  Given the amount of blood in the victim's vagina, Dr. Roh concluded that some of it would have to have been on a condom used in sexual intercourse.

At the outset, Petitioner's claim that the second trial violated the principles of collateral estoppel embodied in the

7

Double Jeopardy Cause of the Fifth Amendment, Ashe v. Swenson, 397 U.S. 436, 445-446, 90 S.Ct. 1189, 1195 (1970), faces a practical problem, which the State has characterized as a failure to exhaust state remedies. To establish his claim, Petitioner must demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding. Schiro v. Farley, 510 U.S. 222, 233, 114 S.Ct. 783, 791 (1994). As determination of that claim requires the court to examine the record of the prior proceeding, id., and apparently Petitioner did not make the record of the prior proceeding part of the record of the proceeding which resulted in the conviction here at issue, the State contends, in the alternative, that the claim has not been exhausted and that Petitioner, without that record, cannot establish its merit. While I am inclined toward both alternatives, I will nevertheless address Petitioner's claim to explain why he would not be entitled to relief, even if he had submitted the record. In doing so, I accept Plaintiff's representation that the State's evidence in the second trial is not materially different from the State's evidence in the first trial.[2]

Petitioner assumes that the State's evidence only supports conviction for the greater offense of manslaughter in the second

---

[2] The reliability of this assertion is subject to doubt because, according to Petitioner's post verdict memorandum to the state trial court at 2 (Resp. Exh. 11, Vol. II at 165), the first jury alone heard from Donna DeGroat that both Petitioner and the victim had been instructed to avoid sexual intercourse.

degree or manslaughter in the first degree because, according to Petitioner, at the first trial the lesser included offense of criminally negligent homicide was submitted to the jury on the basis of the testimony of the expert physician for the defense. A summary of that evidence appears in the decision of the New York Court of Appeals. 94 N.Y.2d at 571-572, 708 N.Y.S.2d at 45-46. The assumption(s, which may have motivated the state trial court at the first trial to submit a lesser included offense to the jury, did not limit that jury's consideration of all of the evidence. The jury returned a general verdict on the charges presented, which leaves the record silent concerning whether the first jury relied on the defense evidence to find Petitioner guilty of criminally negligent homicide or relied on inferences to be drawn from the State's evidence.

Having reviewed that evidence, I am not prepared to report that there is no path of reasoning and/or drawing inferences from the circumstances that leads to a conviction for criminally negligent homicide. Contrary to Petitioner's unstated assumption, neither jury was required to accept at face value the testimony of the State's pathologists concerning the number or nature of the blows necessary to have produced the injuries they found nor their descriptions of comparative circumstances which would have produced those injuries. Lay jurors may easily infer that abdominal injuries sustained from multiple blows or falling off a roof or a serious automobile accident may not necessarily

be fatal.

With respect to criminally negligent homicide, the "analysis focuses on the actor's awareness of the risk that death will result from the act, not whether the underlying act is intentional." People v. Heide, 84 N.Y.2d 943, 944, 620 N.Y.S.2d 814, 815 (1994) (mem.). The accused may commit an intentional act forcefully without understanding or comprehending that it will have fatal consequences.

The record compels the conclusion that Petitioner engaged in some sort of physical contact with May DeGroat. He may have hit her, as the circumstantial evidence and the pathologists suggest, or he may have engaged in rougher sexual activity with her than he was willing to admit to the police. Whatever physical contact occurred, it was sufficient to produce May's death, which Petitioner did not intend to cause. When he realized that May had been vulnerable and that he had indeed caused her death by doing what he should not have done, he repeatedly attempted to explain away the end result in statements consistent with a consciousness of guilt. Whatever intentional act had produced the physical contact, nothing in the record precluded the jury from finding that he had failed to perceive that the act risked causing death to May.

As a second claim, which was not pled in the "grounds" section of the form petition but was added to the argument, Petitioner contends that he was denied the effective assistance

of counsel because trial counsel at the second trial failed to present the evidence that the defense had presented at the first trial.  This claim has not been presented to the state courts and in any event, has no merit.  Petitioner has presented nothing to contradict the patently obvious inference that given the acquittals at the first trial, counsel chose, as a matter of tactics, not to present it at the second trial.  If the State's evidence had failed to persuade jurors to convict of more serious offenses and the defense evidence had been the motivation for the finding of guilt of the lesser included offense of criminally negligent homicide in the first trial, a reasonable defense lawyer might elect to forego its presentation in a second trial where the only charge was criminally negligent homicide.

Pending my study of the claims presented, I did not rule on Petitioner's application for appointment of counsel.  Having found that it does not raise any complex factual or legal issues and that a hearing is not necessary to adjudicate it, I have determined that appointment of counsel would not be likely to lead to a more just determination in this case and have proceeded accordingly to render this report and recommendation.

Based on the foregoing, I respectfully recommend that your Honor dismiss this Petition.

## NOTICE

Pursuant to 28 U.S.C. §636(b)(l), as amended, and Rule 72(b), Fed.R.Civ.P. the parties shall have ten (10) days, plus an

additional three (3) days, pursuant to Rule 6(e), Fed.R.Civ.P., or a total of thirteen (13) working days, (see Rule 6(a), Fed.R.Civ.P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson, at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned, at the said Courthouse.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order or judgment that will be entered by Judge Robinson. See Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298 (2d Cir.), cert. denied, 506 U.S. 1038 (1992); Small v. Secretary of H.H.S., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); Wesolek v. Canadair, Ltd., 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge Robinson and should not be made to the undersigned.

Dated: September 28, 2005
White Plains, New York

Respectfully submitted,

_____
Mark D. Fox
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been sent to the following:

The Honorable Stephen C. Robinson

Mr. Michael Maragh[3]
39 West Street
Port Antonio, Jamaica, West Indies

Mr. Michael Maragh
64-10A 186th Lane
Fresh Meadows, New York 11365

Andrew R. Kass, Esq.
Assistant District Attorney
County Government Center
Goshen, New York 10924

---

[3]The records of the New York State Department of Correctional Services indicate that Petitioner, Michael Maragh (02-A-6604), was conditionally released to immigration authorities and thereafter housed at York County Prison in York, Pennsylvania. He also had indicated this information on the front of the Petition in this case. Since that time, the record in this proceeding does not indicate any additional communication from Petitioner, even though the docket sheet indicates an address in Queens.

A search of the records of this Court indicates that Michael Maragh, at the address indicated, filed a petition for writ of habeas corpus to challenge his exclusion from the United States. 05 Civ. 2337. The docket sheet indicates that Petitioner filed a reply to the Government's opposition in March 2005 and that Judge Preska transferred the matter to the Court of Appeals pursuant to the REAL ID Act of 2005 on May 27, 2005. Staff in my chambers has learned by telephone call to the York County Prison in York, Pennsylvania that Petitioner was deported to Jamaica on February 22, 2005. Under the circumstances, I have sent a copy of this report and recommendation to both of what appear to be the last known addresses for Petitioner.

13